

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN, TEXAS

**PRICE DANIEL**
ATTORNEY GENERAL

August 20, 1948

Hon. Bascom Giles, Commissioner
General Land Office
Austin, Texas

Opinion No. V-662

Re: Relinquishment Act -
Ten Cent per acre per
annum minimum payment.

Dear Sir:

Your letter of May 26, 1948, furnishes for our consideration an oil and gas lease, dated April 23, 1941, for a primary term of 10 years and executed pursuant to the Relinquishment Act (Arts. 5367 and 5368, V. C. S.). The lease contains no delay rental provision but does provide for annual payments which are designated "minimum royalty." The State received one-half of the amount paid when the lease was executed and has received one-half of all minimum royalty payments which have been made to date. All of the land covered by the lease is not subject to the Relinquishment Act, but as to the land which is subject to such act, the State and landowner have shared equally in all amounts so far received. You request opinion as to whether the annual minimum royalty payments provided for by the lease satisfy that portion of the Relinquishment Act which requires that a minimum annual payment or rental of 10 cents per acre be paid to the State.

The following provisions of the lease bear on this question:

"2. This lease shall be for a term of ten (10) years from this date (called primary term), without reference to the commencement, prosecution, or cessation at any time of drilling or other develop-

ment operations, or to maintenance or cessation of production, or to the discovery or nondiscovery during this primary term of oil, gas, or other mineral on the leased premises; but if and whenever oil, gas or other mineral is discovered in paying quantities on the leases premises during the primary term, Lessee agrees to reasonably develop the area thereon capable of producing oil, gas, or other mineral in paying quantities, and shall at all times protect the leased premises from drainage by wells on adjacent property in the manner and to the extent that a reasonably prudent operator would under the same or similar circumstances. Except as expressly provided herein, Lessee shall not be under any obligation during the primary term to drill or develop the premises against its will. . . .

"7. The royalties to be paid by Lessee, subject to Paragraphs 8 and 9 hereof, are: (a) on oil, one-eighth of that produced and saved from said land, the same to be delivered at the wells or to the credit of Lessor into the pipe line to which the wells may be connected; Lessee may from time to time purchase any royalty oil in its possession, paying therefor the market price prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas or other gaseous substance produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; and (c) on all other minerals mined and marketed, one-eighth, either in kind or value, at the well or mine, at Lessee's election, except that on sulphur the royalty shall be One Dollar ($1.00) per long ton. . . .

"8. Lessee does hereby agree, bind, and obligate itself to pay to Lessor, or to the credit of Lessor in the Corpus Christi National Bank at Corpus Christi, Texas, (which bank and its successors are Lessor's agent and shall continue as the depository hereunder regardless of changes in the ownership of said land or the payments hereunder) the sum of Forty-three Thousand One Hundred Twenty-two Dollars and five cents ($43,122.05) upon the delivery of this lease, and on or before the 23rd day of April, 1942, and on or before the 23rd day of April of each year thereafter up to and including the 23rd day of April, 1950, in like manner pay to Lessor, or to Lessor's credit in said depository bank an annual payment of Thirty Four Thousand Four Hundred Ninety-seven Dollars and sixty-four cents ($34,497.64). Such payments are to be the minimum royalties payable under this lease. The said payments may be made by check or draft of Lessee mailed or delivered to Lessor, or said bank, on or before each date of payment. . . Lessee shall also make the payments due the State of Texas on the mineral classified land as more fully set out in Paragraph 21 hereof.

"9. It is expressly agreed that should Lessee produce oil, gas, or other mineral from the leased premises during the primary term, Lessee shall have the right and is hereby expressly authorized to appropriate and be the owner of all the royalties provided for in Paragraph 7 above accruing or to accrue under the terms and provisions hereof during the year immediately succeeding each annual minimum royalty payment due date, beginning with April 23, 1942, until such royalties amount in value to the minimum royalty paid under Paragraph 8 for such year; it being the intention that this right of Lessee to reimbursement is only the right to appropriate the royalties accruing

under the provisions of Paragraph 7 of this lease in any such year until they have in value equalled the minimum royalty paid under the provisions of Paragraph 8 for that year, Lessee having no right where the royalties paid under the provisions of Paragraph 7 during any such year exceed in value the minimum royalty paid under the provisions of Paragraph 8 for that year to apply the excess to the minimum royalty to be paid under the provisions of Paragraph 8 above for any other year where the royalties to be paid under the provisions of Paragraph 7 above have not been sufficient to repay such minimum royalty, the purpose being to allow Lessee to reduce or to repay fully, as far as the amount of royalties payable under the provisions of Paragraph 7 hereof will permit, the minimum royalty payable under the provisions of Paragraph 8 hereof for any such year with royalties accruing under the provisions of Paragraph 7 hereof during such year and not otherwise. Lessee shall have a lien on such royalties to secure its reimbursement as limited by the provisions above.

"10. Either before or after the expiration of the primary term of this lease, Lessee may at any time, and as often as it may elect, execute to the Lessor a recordable instrument and deliver to the Lessor or to the depository designated herein, or file for record in Jim Hogg County, Texas, a release or releases covering any portion or portions of the land then covered by this lease and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered; provided, however, that no release shall relieve Lessee of its duty and obligation to pay the minimum royalty installments as provided in Paragraph 8 hereof exactly in accordance with the provisions of said Paragraph 8, subject only to Lessee's limi-

ted right to appropriate the royalties accruing under the provisions of Paragraph 7 hereof by way of reimbursement of minimum royalties payable under the provisions of Paragraph 8 hereof in the manner and under the circumstances only as provided in Paragraph 9 hereof. . . .

"21.  Of the lands covered by this lease, Section 210, Certificate 105, John H. Gibson, containing 640 acres, Section 212, Certificate 24, C.C.S.D. & R.G.N.G. Ry. Co., containing 640 acres, Section 276, Certificate 229, C.C.S.D. & R.G.N.G. Ry. Co., containing 640 acres, and section 901, Certificate 1604, J.G. Mason, containing 481 acres, were sold by the State of Texas with a mineral reservation. As to such lands Lessor acts individually and as agent for the State of Texas. Lessee is authorized and instructed to pay to the State of Texas fifty cents per acre on such mineral classified land, or a total of Twelve Hundred Dollars Fifty Cents ($1200.50), when this lease is executed and delivered and to pay to the State of Texas forty cents per acre on such mineral classified land, or a total of Nine Hundred Sixty Dollars forty cents ($960.40) on or before the 23rd day of April, 1942, and on or before the 23rd day of April of each year thereafter as long as minimum royalty payments are made in accordance with Paragraph 8 of this lease."

It is evident from the quoted provisions, and especially from Paragraph 10, that Lessee has absolutely obligated itself to pay the so-called minimum royalty provided for in Paragraph 8.  It is also evident that the duration of the lease during its primary term is in no way dependent upon these payments.  For all practical purposes, the lease is a 10-year "paid up" lease.

The benefits accruing to the State and Land-

owner under a Relinquishment Act lease are discussed by R. W. Yarborough, former Assistant Attorney General, in a letter dated August 10, 1933, addressed to J. H. Walker, then Land Commissioner, wherein it was said:

"Following the Empire case, the Supreme Court of Texas has re-announced the rule in Lemar v. Garner, 50 S.W. (2d) 769, at page 773, in the following words:

"'This holding of the Court of Civil Appeals conflicts with the holding of the Supreme Court in the following cases: Greene v. Robinson, supra; Empire Gas & Fuel Co. et al v. State, 47 S. W. (2d) 265, not yet recorded (in State report). It was held in those cases that the Relinquishment Act authorized the oil and gas to be sold retaining to the State as a minimum 1/16 of all gas and minerals as royalty and 10 cents per acre per annum and 1/2 of all amounts received by the owner over and above the foregoing amounts. In other words, it logically follows that, by the language used in this act, as construed by the Supreme Court, the state is to receive as a minimum for the sale of the gas and oil 1/16 of all gas and minerals as royalty and 10 cents per acre per annum as rental, and all amounts received over and above the foregoing amounts shall be equally divided- 1/2 to be received by the state and 1/2 to be received by the owner of the land for his services in making the lease as the agent of the state during the term of the lease.'

"We construe the opinion of the Supreme Court to mean that the initial cash payment made at the execution of the lease is divided equally between the State and the landowner. If no subsequent lease rental be stipulated, the State receives 10¢ per

acre per annum. If an annual lease
rental be expressly stipulated, the
State and the landowner share equally,
provided the State's share be not less
than 10¢ per acre per annum. In figur-
ing the annual rental installments of
10¢ per acre, the initial bonus is not
to be considered, but the initial bonus
must be split 50-50 at the time of the
execution of the lease."

The lease under consideration in that letter
was a 10-year paid up lease. The question was whether
the 10 cent minimum payment required by the Relinquish-
ment Act should be deducted from the State's share of
the bonus, and it was decided that the payment should
be made in all events and should not be deducted. As
was clearly held in the Empire case and in Lemar v.
Garner, cited in the foregoing letter, one-half of all
amounts received for the lease, over and above royalty,
and the 10 cent minimum payment, go to the State.

Actual production and payment of royalty
thereon will not abate the 10 cent payment, which
must be paid to the State throughout the life of the
lease and is in addition to the sums received by the
State as royalty from the oil and gas produced. Arti-
cle 5368; Navarro Oil Co. v. Cross, 162 S.W. (2) 677,
679, Com. App. 1942, opinion adopted Supreme Court.
This is in keeping with your departmental construction
of the Act.

From the foregoing, it is evident that the
10 cent per acre per annum minimum payment required
by the Relinquishment Act must be made irrespective
of production and even though the lease contains no
delay rental provision. For these reasons, the pay-
ment is unlike the usual delay rental payment and par-
takes more of the nature of ordinary rent. Texas
Jurisprudence, Vol. 31a, page 826, citing Commission-
er of Internal Revenue v. Wilson (CCA, 5th 1935), 76
Fed. (2) 766, says that: "Delay rentals on oil and
gas are rents. They accrue by the mere lapse of
time like any other rent. . . While having some like-

ness to a bonus payment, the delay rental is not directly or indirectly for oil to be produced, but is for additional time to utilize the land." For the purpose of classification and analysis, the 10 cent payment must be classified as "rental" as distinguished from "bonus" or "royalty."

The terms "bonus" and "royalty" are discussed in State National Bank of Corpus Christi v. Morgan, 143 S. W. (2) 757, 760, Com. App. 1940, opinion adopted by the Supreme Court, wherein the following definition was approved: "Bonus is merely a convenient term applied indiscriminately to consideration for the lease (whether in money or oil) over and above the usual royalty."

It would seem that the minimum royalty payments under investigation constitute additional consideration over and above the usual and customary royalty which in Sheppard v. Stanolind Oil & Gas Company, 125 S. W. (2) 643, 647 (writ refused) is defined as a fractional part of the oil and gas or its value when produced. If an oil payment, payable out of a fractional part of production, is bonus, as was held in State Nat'l Bank of Corpus Christi v. Morgan, then a payment absolutely to be made during the primary term would doubtless also be bonus. The fact that the parties to the lease designate the payment royalty does not make it so. State National Bank of Corpus Christi v. Morgan.

Treating the payments under consideration as "royalty", if the 10 cent payment is required even though the lease is producing, why should the payment abate if the "royalty" is paid in cash in advance of production?

If the payments are "bonus", they fall within the category of "other payments" which according to the Empire case are to go one-half to the State and one-half to the landowner and in addition to which the State is to receive royalty and 10 cents per acre per annum.

Whether the payments under consideration be "royalty" or "bonus", they are not "rental" since they do not become due by mere lapse of time, but are simply payable over a 10 year periòd,nor do they permit lessee an additional time within which to utilize the land. Although payable annually, they are absolute obligations and their payment or non-payment has no effect upon the primary term of the lease. Whatever the technical definition of the 10 cent minimum payment, it is clear to us that the payment is a form of rent and as such is to be distinguished from bonus and royalty as these terms are ordinarily understood and defined. It is equally clear that the minimum royalty payments under consideration do not constitute, in any respect, a form of rent, and, in our opinion, their payment will not satisfy the 10 cent payment required by the Relinquishment Act.

Any other construction of the lease would permit the lessee and landowner to do by indirection what otherwise could not be done. Under an ordinary paid up lease, the 10 cent payment must be made. The lease under consideration is in all material respects "paid up." A lessee and landowner have the right to adopt this type of lease as being better suited to their individual situations. They should not, however, be allowed to have a lease by the terms of which all of the benefits of a paid up lease are secured to them and at the same time effect a saving at the expense of the State. We cannot construe the Relinquishment Act as so extending the scope of the landowner's agency.

<u>SUMMARY</u>

The annual payment of 10 cents an acre required by the Relinquishment Act (Art. 5368, V.C.S.) applies to a lease by a landowner providing for a "minimum royalty" in a fixed amount payable annually over a ten year period. Such a lease is in legal effect a paid

up 10 year lease and the 10 cent
per acre statutory payment is due
the State in addition to one-half
of the cash consideration and one-
half of the royalties.

Yours very truly

ATTORNEY GENERAL OF TEXAS

HDP:bt

By     H. D. Pruett, Jr.
Assistant

APPROVED:

Price Daniel
Attorney General